## PHICO Insurance Co. v. Philadelphia College of Osteopathic Medicine

*Kenneth Murphy,* for plaintiff.
*Ann Laupheimer,* for defendant.

TERESHKO, *J.,* December 20, 2000—This matter was tried before the court sitting without a jury.

The complaint seeks relief under principles of contract and common-law indemnification.

The facts and background of this matter involves the sometimes arcane world of medical malpractice insurance through its various levels from primary insurer through to the Medical Catastrophic Loss Fund (CAT Fund).

The underlying medical negligence action dates back to a 1987 surgical procedure. In February of 1988 a com-

plaint was filed alleging medical negligence against instant defendant Philadelphia College of Osteopathic Medicine and individual medical providers. All defendants were primarily insured under plaintiff PHICO or (now dissolved) Physicians Insurance Company.[1] Under Pennsylvania's statutory scheme, PHICO provided the first level of coverage of $200,000 for PCOM. The next level of coverage up to $1,000,000 would be provided by the CAT Fund. In order to trigger the CAT Fund coverage, PHICO's policy limits for PCOM would be tendered to the CAT Fund. In order for PHICO to tender its limits to the CAT Fund, the consent of its insured, PCOM, was required. It is undisputed that defendant did not give its consent to PHICO to tender its limits to the CAT Fund.

Defendant made it clear that it wanted to defend this case on the medical negligence issue. Therefore, a trial on the merits ensued in April of 1991. During the trial, the CAT Fund entered into separate negotiations with the plaintiff and settled the matter. This was against the express direction of both PHICO and PCOM who are plaintiff and defendant here. As a consequence of the settlement by the CAT Fund, all actions against the initial negligence defendants were settled.[2]

In April of 1994, the CAT Fund filed a contributing action against PHICO seeking a payment of its insurance limits to recoup some of the money it paid to settle

---

1. The issues regarding other defendants will not be further discussed.

2. Because PHICO was not then required to make payment to the CAT Fund, it did not initiate any adjustments of premium against PCOM.

the negligence action. PCOM was not joined as a party to this action nor was it notified of the action by either the CAT Fund or PHICO.

In June of 1996, PHICO settled the CAT Fund suit by paying the amount of the primary policy to the CAT Fund. PCOM did not participate nor did it receive notice of the settlement.

Under the contract of insurance in existence, PHICO had a right to perform a retroactive review of the amounts paid on behalf of the insured and then make a retroactive rate adjustment which would have allowed PHICO to recover the funds it paid to settle the CAT Fund lawsuit. PCOM challenged the retroactive adjustment and the instant suit followed.

After receiving plaintiff's evidence, defendant motioned to the court for a nonsuit on both counts of the complaint.

The court granted defendant's motion on the contract issue as it was clear and uncontested that any settlement of a claim under the policy could not take place with defendant's consent and that plaintiff never secured defendant's consent either under the original negligence action or under the subsequent CAT Fund action. Denial of the contract action also cuts off plaintiff's ability to recover under any theory of being able to apply the retroactive rate revision provision of the contract or its derivative claims.

Plaintiff's potential recovery lies with its claim for indemnification.

Defendant first argues that before any claim for indemnification can be considered plaintiff must show that notice of the earlier settlement had been given to it.

There is good evidence to show that defendant was not given notice as required. However, this is not fatal to the action.

In *Ultramed Inc. v. Beiersdorf-Jobst Inc.,* 98 F. Supp.2d 609 (1998), citing *Martinique Shoes Inc. v. New York Progressive Wood Heel Company,* 207 Pa. Super. 404, 217 A.2d 781 (1966), the law of Pennsylvania was established as allowing the indemnity action to proceed, notwithstanding lack of notice, but requiring plaintiff (indemnitee) to meet the burden of showing that the payment was both legally appropriate and reasonable. Stating it in the converse, defendant has the right to challenge the underlying facts which resulted in the settlement.

The competent evidence supporting the underlying settlement follows herein.

As is often the case in medical malpractice litigation, a substantial amount of settlement negotiation occurs prior to the matter coming to trial.[3] This dynamic includes discussions between lawyers, insurance carrier representatives and the court.

At some point, the settlement discussion included a settlement value of $1 million being placed on the case by Judge Moss. In addition, Judge Lord, who was the trial judge, placed a settlement value of $1.7 million on the case. This is of note because two very experienced and well respected trial judges valued the case at, or in excess of, $1 million. From the testimony there did not

---

3. As the team leader of the Day Forward 1996 and 1999 programs, this court is intimately familiar with this process.

appear there would be a vigorous liability defense but a more aggressive defense as to causation/damages and apportionment of same. There was an underlying issue regarding this apportionment because the former carrier, PIC, had two policies of insurance which were also exposed. It appeared through testimony that each carrier was withholding its consent and was waiting for some movement from the other carrier before tendering its policy. This caused an impasse to settling the case.

It further appears that the CAT Fund was concerned that if the matter was not settled, a significant plaintiff's verdict was very possible, thereby exposing the medical provider to excess liability. (See P-5.) The CAT Fund began separate negotiations with plaintiff and settled the case for $1.45 million on behalf of all defendants thereby limiting any further exposure of defendant or its employees. Under the subsequent action of the CAT Fund, PHICO settled by paying its limit of $200,000 to the CAT Fund. (PIC also settled by paying its limits of $400,000.)

These facts establish that the indemnitee did make a payment on behalf of the indemnitor. Further, considering all the evidence, the payment was reasonable and was in satisfaction of an obligation that defendant would have been required to make as a defendant in the underlying action, had the matter not been settled.

Therefore, under principles of common-law indemnification, the court finds in favor of plaintiff and against defendant in the amount of $200,000.